# EXHIBIT 3

| | |
|---|---|
| **From:** | Thomas Mars |
| **To:** | Ken Senser |
| **Subject:** | FW: IMPORTANT: WALMEX Memo |
| **Date:** | Saturday, October 15, 2005 8:26:10 PM |
| **Attachments:** | WALMEX RE - Torres Landa emails 10-13 & 10-7-05.doc |
| **Importance:** | High |

FYI

-----Original Message-----
From: Thomas Mars
Sent: Sat Oct 15 17:58:07 2005
To: Mike Duke
Cc: Tom Hyde - Executive
Subject: IMPORTANT: WALMEX Memo

Mike:

The attached memorandum summarizes an interview conducted earlier this month with a former WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including senior people.

You'll want to read this. I'm available to discuss next steps.

PS: Welcome to Wal-Mart International.

-----Original Message-----
From: Maritza Munich-Legal
Sent: Sat Oct 15 17:42:31 2005
To: Thomas Mars
Subject: WALMEX Memo

<<WALMEX RE - Torres Landa emails 10-13 & 10-7-05.doc>>


~Maritza
=====================
MARITZA I. MUNICH
VP & General Counsel - International
WAL* MART STORES, INC.
(479) 277-2346

From: **Juan Francisco Torres Landa R. [mailto:jftl@bstl.com.mx]**
Sent: **Thursday, October 13, 2005 9:16 PM**
To: **Maritza Munich-Legal**
Cc: **RICARDO PONS**
Subject: **WALMEX**
Importance: **High**

## **CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION**

Dear Maritza:

At your request we have conducted a second meeting with Sergio Cicero ("SC"). The purpose of this meeting was to follow-up to the comments made during our meeting with him last week and hence try to obtain more specific data and reference to dates, specific events and persons involved.

With out goal in mind, we had a 2 hour meeting with SC today, same that resulted in the following basic issues:

a) <u>Contributions for improvement of proceedings in the Federal District</u>:

- A total contribution of Mex$2 million (net amount) was delivered in 8 partial payments during the end of 2003 and part of 2004.
- These amounts were delivered pursuant to the instructions of Javier del Rio with the knowledge of the President (depending on the time, either Cesáreo Fernández or Eduardo Castro).
- The main contact person to negotiate such contribution on the part of the government was Mr. Graco Ramírez (PRD Congressman).
- The payments were allegedly made to facilitate the steps with the Urban Development Ministry as regards the urban impact statement for new sites.
- Even though the payments were made through an outside law firms (grossed up to reflect the impact of Income Tax, Value Added Tax and professional fees), they were handled in partial cash payments handed over to persons receiving the corresponding envelopes.
- SC witnessed at least 2 of those cash deliveries just to make sure that they were being turned over to the designated persons.
- In spite of those payments, in this case there was no noticeable benefit of a speedy resolution of the corresponding urban impact analysis.
- This method was used at the time given the huge pressures to get permits in place. The pressure was less in 2005 because it was possible to locate more properties than stores were needed to be opened.
- In any event, the accounting codes for the contributions were authorized by the President of the company, particularly these contributions to the Federal District government.
- SC claims having one such code of accounting catalogue of payments signed by Mr. Javier del Rio.

- Among the external law firms used one recommended by SC was headed by Mr. Jesús Huitrón. These were small law firms as big corporate firms would not be easy to handle or even accept the assignments.
- Law firms would issue receipts for legal fees with codes to confirm which accounting entry was being covered.
- The comptroller Eduardo Juárez received on a monthly basis an extract prepared by SC of the individual sites expenditures and the accounting codes. Two additional copies in closed envelopes were delivered to Javier del Rio one of which was labeled to be delivered to the President.

b) <u>Teotihuacán Site</u>:

- During 2002 and 2003, and given the pressure to open new sites, the State of Mexico was confirmed as a strategic area of growth.
- The main problem in this State had to do with zoning licenses and how those could impact the ability to open new sites.
- At the instructions of Javier del Rio, and given that a periodic global review was underway at the State level, SC and an outside firm arranged for the State plans to specifically foresee changes of zoning in those places were a new site was envisioned to be opened.
- The purpose was to have areas qualified from the beginning to avoid having to apply for zoning changes that would be costly and time consuming.
- One of such sites that were adjusted was placed in the area near the Teotihuacán pyramids to open a Bodega Aurrerá.
- With the zoning state license in place, negotiations to conclude a Lease Agreement with the owner were conducted.
- The Municipal operating permits were complicated because in this particular area in addition to the Major, the Municipal Council and the neighbors also participate in the decision.
- To secure the approval from the Municipal Council and with the active reporting at that time to José Luis Rodriguez, Mex$1,250,000.00 were delivered to 7 of the 11 Municipal County members.
- The neighbors were convinced without any contribution, but just accepting to perform some local community works.
- The National Institute of Anthropology and History (INAH) asked for an official donation of Mex$400.000.00, but the INAH's President received an irregular payment of Mex$150,000.00 to give approval for the corresponding construction site given its proximity to the archeological site.
- The construction was underway when in August 2004 the Municipal President alerted the company about the problems with some public/street market representatives. The problem exploited because these groups were under estimated.
- While the noise generated by those groups faded with time, the potential of that problem gaining strength again is there.

c) <u>Chamapa Distribution Center</u>:

- Again in this case the instructions to secure the electricity supply required at the site (in spite of limitations for prior applicants) was given by Javier del Río.

- In the monthly telephone conference calls to a US committee reference were made to the power supply problem but never any concrete data of what solutions were being considered.
- A US-Mexico Committee was assigned to follow-up on the construction of this very important distribution site.
- Given the lack of availability of power supply Mex$1,500,000.00 were paid to obtain the required capacity from the power supply company (Luz y Fuerza del Centro).
- The payments were divided in 2 in order to try to ensure that the required supply was going to be confirmed by the power company. The same method using an external office was used for the cash deliveries. The company acted in tandem with the law firm to get everything in place.
- The risk still exists that an audit by the power company could reflect the fact that this was an irregular handling given that other petitions for supply were in existence before. However, it is unlikely for there to be a problem given the time the agreement has been in place already.
- However, the discrepancy between the power supply contract and the actual receipts is evident.

d) <u>Sam's Club at FFCC Hidalgo - Mexico City</u>:

- This store was finished in December 2003; it used to be an old Ford factory installation.
- The main obstacle in the origin has to do with the urban impact assessment that would have been required given the expansion of the original plant in an additional 3,500 square meters.
- This site is located in the Gustavo A. Madero Delegation.
- When it was determined that it would take several months to go through the permiting process and given the proximity of the start date, several options to try to speed up the process were analyzed.
- Once it was determined to start construction, during such process the final solution agreed upon with government officials was to substitute in the central records of the Delegation the original map of the Ford facility so that the expansion area would be indicated as if originally existing at the site. Pursuing this method effectively resulted in only applying for a remodeling license for painting and upgrading the facility, but no material construction taking place.
- Javier del Rio authorized these actions with the approval of the Presidency. Eduardo Castro as the Comptroller was also aware of these issues.

e) <u>General Comments</u>:

- The 8 binders that SC has basically cover 150 cases.
- Each case is made up of copies of checks, government receipts, legal fees receipts, authorization signatures and SC's explanation notes.
- SC prepared those notes in order to protect him in case of any complaint or investigation about the destination of the funds used to obtain permits for the opening of sites.
- SC only has a few copies of the monthly reports delivered to Senior Management about all expenses made.
- SC's team was not aware at all of these payments as the information was limited to Senior Management and himself.

- SC only met with the outside law firms outside of Wal Mart's legal department to prevent any direct contact with his own team.
- SC has lost contact and does not know the current whereabouts of Mr. Huitrón.
- SC is unaware as to how the company is operating currently or how it is solving the time limitations for new sites' openings.
- Another deficiency that he detected in due course had to do with the fact that properties that were purchased seldom had any appraisal to validate the value at which the properties were being acquired. The validation for value was based only on the sites' ability to produce sales but not on its fair market value. In one such case a site in León, Guanajuato was bought for 9 times the appraised value (because in this State an appraisal was needed to take title to the land, but was not used at the time of negotiation).
- The receipts that were issued by the law firms did not necessarily match the specific site for which the work was performed because they were divided in order not to have large amounts concentrated in one single site. The receipts did have some marks to match the accounting code for irregular payments.
- SC does not have any real thoughts about what to do with the existing binders; he fears they may be used against him. Nonetheless, if asked he may agree to release an example for our quick review.
- He has mixed filings about how the work was performed before and what justification he may find in order to find peace of mind about all the irregular payments made at the time.
- He was concerned at the time and effectively was under a lot of pressure and stress.
- One of such pressures had to do with the fact that government agencies would often become greedy and start demanding more to get to a solution on the issuance of permits, situations that often led to the need to provide additional funds.
- Problems of that sort of additional demands were present, for example, at a construction of a Wal Mart and Sam's Club site in Villahermosa, Tabasco.
- These types of operating and construction needs are almost exclusive to Wal Mart because other competitors do not have the volume of sites and opening problems to be resolved.
- SC is somewhat frustrated about not being able to use his professional experience because no other company has the needs that Wal Mart does.
- The approval committee in Mexico never really reported the problems encountered to the US, as the US was only informed about the selection process and the opening events.
- A latent problem still exists with groups opposing Wal Mart such as those in the case of Teotihuacán and Arboledas that openly act against Wal Mart's activities.
- SC witnessed how those opposing groups were able to communicate to each other, even when located in entirely different areas.
- SC believes that those connections could be made in new sites where groups could joint together and pose a more significant threat.
- SC's opinion is that the real interest from the US Legal Department should not be so much in what happened before, but how the company may still be operating and how decisions are made to resolve problems through illegal means.

\*   \*   \*

These are the new facts that we have been given in today's interview. I sincerely doubt that there will be more concrete information coming this way as SC is not really willing to disclose

the binders. The only thing we can really get from SC could perhaps be access to one of the examples in his binders. Even though we obviously never offered anything for the information in those binders, the reality is that I do not think the information is available either. We need to therefore discuss with you what other steps you think are worthwhile at this time and what to do if you believe a formal investigation should be launched.

With nothing further for the moment, and waiting for your comments, I remain, as always,

Sincerely,

Lic. Juan Francisco Torres Landa R.
BARRERA, SIQUEIROS Y TORRES LANDA, S.C.
ABOGADOS

Montes Urales #470 piso 1
Lomas de Chapultepec
México, D.F. 11000
Dir. (52 55) 5540-8057
Fax (52 55) 5520-5115
jftl@bstl.com.mx
www.bstl.com.mx

========================================================================
This e-mail is private and confidential and contains information intended only for the use of the person named above. If the recipient of this message is not the one intended, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this document in error, please send it to postmaster@bstl.com.mx immediately. Thank you.

ENGLISH VERSION OF E-MAIL ORIGINALLY SENT ON FRIDAY OCTOBER 7, 2005

**CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION**

Dear Maritza:

Pursuant to our conversation this morning and your request, we held a meeting with Mr. Sergio Cícero ("SC"). Subject to our reviewing in greater detail all of the implications of this case, following find an executive summary of the data and remarks that SC stated to us during the meeting this morning.

- SC, a 53 years old attorney, studied at the National Autonomous University of México, from 1972 to 1976.
- He was part of the Wal-Mart Mexico organization during 28 years, occupying until September 2004, the Legal Department of Real Estate.
- SC confirmed that inspite of the fact that after the 1995 financial crisis construction of stores was low, during the last 6 to 7 years (particularly given Wal Mart's acquisition)

- very aggressive growth goals were set. This translated into the need of having new sites open in record times.
- The basic premise was to make whatever was necessary to obtain the result. This policy meant having to distribute resources to facilitate resolving any obstacle that may have existed in obtaining the required governmental authorizations.
- In order not to involve the company directly in any type of corruption, a pair of outside firms were hired so that they would be the ones in charge of making any irregular payment.
- Even though the work was monitored by the legal department, randomly any of the two firms was selected for purposes of performing the actions with the government agencies that may be the recipients of possible extraordinary payments.
- Goals were obtained in all cases. The schedule was very rigid with demanding times and in most cases dealing with new sites.
- A policy of "the goal justifies the means" that was followed included sponsoring irregular payments.
- One such example was the opening of the Wal Mart Distribution Center outside of Mexico City in Chamapa, where the necessary electricity supply would have been normally obtained until 2006 or 2007. Through unorthodox means it was possible to obtain the required supply stepping ahead of other prior applicants. Currently the respective Supply Agreement and the receipts showing the effective consumption do not coincide thus demonstrating the irregular activity.
- The costs distribution method was included in a catalogue with codes identifying the irregular act that would then be purified with such code in the accounting records, nonetheless linking them to the payments made to external firms. This structure was recognized by senior management of the company. Even when the President of the company changed, the instructions were ratified.
- In March 2004 a new legal Vice Presidency was created and Mr. José Luis Rodriguez appointed in that position. This designation was notified one day before to SC, a very painful event for SC that generated significant anger with respect to the lack of recognition of his work.
- SC had various problems with Mr. Rodriguez, in particular when SC was asked to sign directly the expense reports, something that SC opposed. Eventually, according to SC that pressure and other issues led him to leave the company and negotiate his termination on September 1, 2004.
- During all of the time of his performance and the aggressive growth program, SC never had access to officers in Bentonville. The real studies of the sites were never seen in the United States but only selected by the Presidency in Mexico and thereafter just informing the United States of the final results.
- "Dirty clothes are washed at home", and therefore the hidden costs were not known outside of Mexico.
- Since September 2004 and up to this date SC has managed to assemble the information of notes and reports that he had, thus establishing the specific story of the events in each site as to the payment mechanics and others that resulted in obtaining completion dates that would have been impossible to attain if conducted under a strict legal basis.
- A third law firm that existed was eliminated when apparently it was caught abusing in handling amounts that were demanded and that were not even making their way to their final approved destination.
- The President, Real Estate Vice President and Audit Vice President knew of the payment mechanics and even received a detailed schedule of all of the payments performed.

- SC has copies of the various references for each of the sites, a report made based on his own personal files.
- SC stated that his interest is for this system and the respective irregular payments to be known in Bentonville.
- SC claims not to have reported these events previously given the existing pressure at the company and after his termination given the time that he took in organizing all of the data that he now has in several binders.
- He mentioned being available to cooperate to clarify all the facts, as long as he is not personally involved in anything, neither by referring to him personally, nor by requiring for him to actively participate in any investigation.
- When he left the company he was angry at the lack of recognition of his work, in addition to the fact that nobody asked him to stay even after 28 years of work.
- Even though his brother is still in the company the reality is he does not even speak to him, and in fact is not interested in having any contact with him whatsoever.
- SC's current activities are in the field of home construction as a personal business.
- Even though SC does not deny having had contacts with competing companies for possible new employments positions, he has never accepted any offer with them as they have been unattractive. SC mentioned that in his case he would had rather stayed at Wal Mart than with any of the other competing firms because the mechanics may not be that different and nonetheless stability and benefits are far better at Wal Mart.
- The catalogue that SC referred to as having some internal accounting codes to recognize the specific destination of a payment was broken down into the following items:

  - Speed of applications
  - Elimination of a requirement
  - Reduction of mitigation work or conditions
  - Donations in cash without receipt
  - Street vendors, invaders and holders of properties
  - Street markets and public markets
  - Government agencies discretional authority
  - Verbal authorizations
  - Influence, control or confidential information of government agencies
  - Cross-subsidies between projects
  - Follow-up expenses to eliminate fines
  - Presidency instructions to speed-up projects in Mexico City

This is the basic information that was given to us by SC in the referred conversation. No specific new appointment nor any commitment was established other then SC stating that he remained for the time being satisfied for you to have access to this information and that we would then proceed as we determine viable. We did not detect on his part any express statement about wishing to sell the information or receiving any payment. We do not know this person enough to determine if his real motivation was to take this weight off himself or if he assumes or pretends to sell somebody this information and transferred to third parties, and whether that is something we would like to avoid. Evidently our recommendation is never to yield to any blackmail, it being clear that in no moment SC stated this economic interest during today's interview.

With nothing further for the moment, and waiting for your comments, I remain, as always,

Sincerely,

Lic. Juan Francisco Torres Landa R.
BARRERA, SIQUEIROS Y TORRES LANDA, S.C.
ABOGADOS

Montes Urales #470 piso 1
Lomas de Chapultepec
México, D.F. 11000
Dir. (52 55) 5540-8057
Fax (52 55) 5520-5115
jftl@bstl.com.mx
www.bstl.com.mx

======================================================================
This e-mail is private and confidential and contains information intended only for the use of the person named above. If the recipient of this message is not the one intended, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this document in error, please send it to postmaster@bstl.com.mx immediately. Thank you.