# EXHIBIT 6

| From: | Maritza Munich-Legal |
|---|---|
| To: | Mike Duke; Craig Herkert; Tom Hyde - Executive; Thomas Mars; Lee Stucky; Michael Fung; Ken Senser |
| Cc: | Martin J. Weinstein (mweinstein@willkie.com); Daryl Kreml (dkreml@willkie.com) |
| Subject: | WALMEX Real Estate Transactions |
| Date: | Tuesday, November 01, 2005 3:05:06 PM |
| Importance: | High |
| Sensitivity: | Confidential |

**PRIVILEGED & CONFIDENTIAL, ATTORNEY-CLIENT COMMUNICATION**

**FYI, below is Mexico external counsel's report of the meeting held in Mexico City with Sergio Cicero this past Friday 10/28/05. As I have expressed to some of you, during this meeting it became clear the guy wants money -- even though he never asked for money outright:**

- **When I asked him, more than 2 hours into the conversation, what else I could say or do to persuade him to share the documents with me, he leaned forward, and asked, pointedly: "Why would I do that"?**
- **He then complained that at the time of his separation from WALMEX, in addition to statutory severance, he only received US $25K as an additional bonus -- after 28 years of service.** *[It is interesting that he would admit to having received the statutory severance, which is payable only for terminations without cause, when he has all along stated that he resigned.]*
- **He also said he thought that in coming to Mexico to meet him "I would have something in mind."**

**There was also, for the first time, a not-so-veiled threat of blackmail.  SC indicated that, while it was true that in a prior conversation he had suggested he might destroy the documents, he might also "write my memoirs and you can then pick up the book at a bookstore and read about it."**

**Bentonville Legal, Global Security & Internal Audit will meet this week to discuss external counsel's proposed plan of action for the required internal investigation and other next steps.  Will keep you updated.**

**~Maritza**
**=====================**
**MARITZA I. MUNICH**
**VP & General Counsel - International**
**WAL\* MART STORES, INC.**
**(479) 277-2346**

-----Original Message-----


From:   Juan Francisco Torres Landa R. [mailto:jftl@bstl.com.mx]
Sent:   Mon Oct 31 17:22:06 2005
To:    Maritza Munich-Legal
Cc:    RICARDO PONS
Subject: WALMEX


CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION


Dear Maritza:

Following find the summary of the main issues discussed during the meeting held last Friday with Sergio Cicero ("SC").  As a general note we must highlight the fact that about 90% of the information discussed

last Friday had already been disclosed to us during our first two meetings with SC. Therefore, I will not insist on details of events described by SC before. Another clarification is that the information that SC confirmed did not follow a specific order as it was mostly driven by your questions and therefore his statements may appear to be somewhat disorganized because topics were being covered randomly.

With the above thoughts in mind, following find the basic matters discussed during this last meeting with SC:

*   Reference was made to SC about the importance of having specific data in order to be able to conduct an investigation with the required accuracy and speed. SC does not seem to be thrilled or wanting to disclose any further details (including the binders that he has put together) in the absence of some compensation (even though he did not make that specific request that was the only possible interpretation that could be made based on his reluctance to do anything else at this time to make right on what he claims were illegal activities).

*   SC confirmed that he did not participate in video conference calls where the Mexican team would report to Bentonville about real estate proposals and any possible complications or problems with such individual sites. SC claims that he was not invited to those conference calls because he would highlight the complications and Senior Management was not thrilled about reporting problems to Bentonville.

*   SC reported since 1999 to Javier del Rio; before he reported to Federico Coronado. SC became part of the Real Estate Department since 1994.

*   Javier del Rio used to be in Bodega Aurrera before taking up his position in the area of Real Estate Development. SC confirmed that the operation with irregular payments and handling through outside law firms for payments was directly known by Cesáreo Fernández, Eduardo Castro and Eduardo Juarez. However, those meetings were usually held on a one-on-one basis and therefore there are no witnesses about those meetings other than those directly involved. SC did state having met with Javier del Rio and Eduardo Castro together, when some of the transactions were being discussed.

*   He does not believe that Mr. Matute was aware of this methodology as he was never in any meeting with him. He does not admire him as he was a difficult person to get along with.

*   The persons at the Tax and Accounting Departments were not aware of the irregular payments methodology.

*   Bentonville did not really conduct a full audit since 1998 and therefore was not able to detect any of the irregular activities.

*   Persons within Mexico's Internal Audit Office did now about the procedure and therefore any audit was controlled to not highlight those payments; the person here controlling these activities was Eduardo Juarez.

*   Outside of Javier del Rio and Eduardo Castro he was not aware of any subordinate that would really have concrete knowledge of these irregular activities. These topics were discussed as "facilitating payments".

*   Eduardo Castro never signed anything but he was aware of the accounting codes to register the specific methods and payments to be made; such code of disbursements was designed jointly by Javier del Rio and SC. Hence, knowledge about these activities would basically depend on the testimony of Mr. Del Rio and SC himself.

*   The payments at the Teotihuacán site were made only to the majority of the Municipal Council because of the difficulty to address all political parties. Eventually the agreement was only reached with the PRI and PRD representatives (sufficient to secure a majority) for a total net payment of 1.2 million pesos.

*   Outside law firms were in charge of receiving data and performing payments through receipts of legal fees that were grossed up to allow the firm to secure the final amounts needed for payments to government officials.

*   The law firm of Mr. Jesus Huitrón was selected based on some experience that the company already had with him in some litigation in Northern Mexico. Another law firm used was the office of Mr. Alonso Alegria. In total SC remembers using about eight different law firms for these activities.

*   Only SC would talk to the outside counsel and no visits would be allowed within Wal-Mart's premises.

*   Javier del Rio would be the one giving instructions and SC performed the required actions.

*   SC was not aware of how the accounting system was used to match the codes that would indicate what type of payments were being made.

*   The law firms were picked because of their ability to be available and perform according to the instructions given, not because of their sophisticated or important legal practices. The law firms were typically one-person operations (solo practitioners).

\*      In some cases architect firms were also used given their relationship with authorities in those cases where construction licenses or the like were involved. These firms would perform the same role in terms of receiving fees and being in charge of delivering the irregular payments.

\*      The expansion of the Wal-Mart and the Sams located at the "Toreo" in Mexico City started without permits in place and nonetheless resulted in the process being concluded in 3 months without any problems.

\*      The cost of the sites would vary depending on the complications that would surface during the actual construction process.

\*      Payments to the Mexico City government were done in various instances and the total amount reached approximately between 3.5 and 4.0 million pesos.

\*      Javier del Rio told SC that "some people were in conversations with Andres Manuel Lopez Obrador" (mayor of Mexico City) and that the person who would serve as intermediary would be PRD Congressman Graco Ramirez.

\*      The accounting codes were used and marked in the specific invoices to able to trace how and what concepts were being handled in each occasion.

\*      Javier del Rio included the new concept about facilitating payments for the Mexico City Government as a way to get that government's assistance to facilitate the process for expansion of new stores; help that never really materialized.

\*      Payments to the Mexico City Government were performed by using several law firms.

\*      In the binders that SC put together for his own control, he kept copies of the payment orders, the legal fees receipts, the schedule of payments and general data about the receipt with the accounting code signed by Javier del Rio.

\*      Some payments were handled crossing costs from one site to the other in order to avoid dedicating too many resources to one site where its budget was nearing its limits.

\*      The incorporation of Jose Luis Rodriguez Macedo was something SC resented because nobody really approached SC to let him know that this position was going to be occupied by somebody else different from him. SC only received an e-mail addressed to the entire company. SC's reporting relationship changed at some point and he began reporting directly to Rodriguezmacedo rather than to Javier del Rio. SC informed Rodriguezmacedo of the irregular payments. Rodriguezmacedo refused to co-sign with SC the invoices SC submitted for payments to lawfirms, insisting that SC sign then and submit them. SC refused to be the only one signing these invoices as his practice with Javier del Rio had always been that both SC and Mr. del Rio would sign and submit them for payment.

\*      SC had many differences with Mr. Rodriguezmacedo because of his lack of knowledge of how to handle the company's legal needs in the real estate area.

\*      SC was under a lot of pressure given the significant time limitations to obtain all clearances needed.

\*      SC does not have any reason to believe that the irregular payments are still being made at this time, among other reasons, because now there are more sites available and therefore less pressures to open them quickly.

\*.     Generally speaking outside law firms would receive a 5 to 6% commission on payments that they would handle to resolve problems. SC negotiated this fee down from the customary 15% fee charged by law firms for assisting in Real Estate transactions.

\*      During the meeting SC shared some small copies of notes of how he explained what activities were taking place on a per project basis.

\*      SC's wife is an attorney that handles land tenure conflicts; she has no involvement with SC's work nor had any in the past.

\*      All of this information was always hidden from Bentonville although with the accounting codes the payments could be traced as to what their real purpose was; the accounting code catalogue was signed by Javier del Rio and SC claims having such document among his files.

\*      At the Teotihuacán site, agreeing with the Municipal Council was a key aspect as the Municipal President could not act on his own. Likewise, the National Institute of Anthropology and History ("INAH") required an official donation of $500,000.00 pesos and also a personal irregular gift of $400,000.00 for the INAH's Director.

\*      Just before SC left the company he informed Jose Luis Rodriguez of the potential problems that public market representatives could pose in Teotihuacán. Failure to address that source of concerns effectively resulted in the problem exploiting 1 month afterwards. The problems included questioning about how the INAH had been convinced to issue the respective clearances. Wal-Mart is a desirable target for some social groups resisting changes and questioning motivation by foreign firms, especially when some traditional distribution channels are affected.

\*      Severe problems also existed with the residents of the "Club de Golf Hacienda" who eventually were

also linked and joined forces in some way with the guys at the Teotihuacan site.

\*      On August 31, 2004, SC's last day at the company, SC received calls from Raúl Argüelles and Jose Luis Rodriguez indicating that they were very concerned about some problems that had not been resolved. SC wished them luck in their activities as he was no longer responsible to take care of these issues.

\*      SC says the problems and how these were resolved are fairly obvious, for example, by analyzing in the case of the Chamapa Distribution Center just what the difference is between the supply contract and the actual receipts where the extra volume of electricity supply was only possible through an irregular coordination of payments to representatives of the power supply company.  Those payments were handled through three different outside law firms given the sizable amount involved.

\*      Nobody called SC when he left the company, something that he resented after 28 years of services.

\*      He also dislikes the fact that all of the team that worked on the legal development of retail sites was destroyed after many years of putting it together.

\*      When he left the company Mr. Solorzano was only a Vice President of Operations and SC does not believe that he was aware of any of the illegal activities, as these were only known by Messrs. Castro and Del Rio.


\*        \*        \*


We called SC today just to validate some of the names and dates he mentioned during Friday's meeting.  In this brief telephone conversation he said that after this meeting his impression was that this case had been closed as regards possible further contacts with us. He also said that that "he had decisions to make."  I informed him that we would report back to you on our findings and summary of the meeting and would call him if there were any other issues worth exploring with him.

I guess given where we are with these issues now, the company will need to decide whether it is worth contacting SC for any other purposes or whether the rest of the investigation will be conducted internally.  It is difficult to know what if any other actions SC may take with respect to disclosure of the information to other sources, something that could be read between the lines based on what he mentioned to us last Friday and his statement during our telephone conversation today.

With nothing further for the moment, and waiting for your comments, I remain, as always,

Sincerely,

Lic. Juan Francisco Torres Landa R.
**BARRERA, SIQUEIROS Y TORRES LANDA, S.C.**
**ABOGADOS**

Montes Urales #470 piso 1
Lomas de Chapultepec
México, D.F. 11000
Dir. (52 55) 5540-8057
Fax  (52 55) 5520-5115
jftl@bstl.com.mx
www.bstl.com.mx

=======================================================================

**This e-mail is private and confidential and contains information intended only for the use of the person named above.  If the recipient of this message is not the one intended, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this document in error, please send it to postmaster@bstl.com.mx immediately.  Thank you.**