UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>WAL-MART STORES, INC. and MICHAEL T. DUKE,<br><br>               Defendants. | No. 5:12-cv-05162-SOH<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1.      This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired the common stock of Wal-Mart Stores, Inc. ("Walmart" or the "Company") between December 8, 2011 and April 20, 2012, inclusive (the "Class Period"), against Walmart and its Chief Executive Officer ("CEO") Michael T. Duke ("Duke"), for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Walmart operates in three business segments: Walmart Stores U.S., Walmart International, and Sam's Club.  Leading up to and throughout the Class Period, Walmart held itself out to investors as a company with an unrelenting commitment to ethics and integrity. Walmart CEO Duke himself assured investors of the importance he placed on knowing "about issues upfront *so we can work to resolve them immediately*."[1]  He also personally condemned inaction in the face of potential wrongdoing because, as Duke recognized, doing nothing in response to questionable behavior condones it.

3.      But behind these grand statements was a company that, by the 1990s, realized its domination of the U.S. market meant that it would have to rapidly expand its international operations if it wanted to continue its march to becoming the largest retailer in world history. International growth, however, is often fraught with logistical difficulties, which means – when pursued honestly – it can be tricky and slow.  Walmart's greed easily trumped its integrity.

---

[1]      Emphasis is added throughout unless otherwise noted.

4.      In 1990, Walmart did not have a single store in Mexico.  By 2005, when Duke took over the reins of Walmart International, Walmart was well on its way to becoming the largest private employer in Mexico.  Upon arriving in his new position, Duke was greeted with an explanation for Walmart's explosive growth in Mexico:  millions of dollars in bribes paid to officials for, among other things, building permits throughout the country (the "Suspected Corruption").

5.      Faced with the choice between living up to their professed ideals and fueling their appetite for growth, Walmart and Duke chose growth and the path of inaction in the face of corruption – the very concept Duke would publicly condemn several years later as Walmart's CEO.

6.      Defendants' condoning inaction remained safely secret until the Fall of 2011, when they learned that *The New York Times* ("*Times*") was investigating the Suspected Corruption.  Once again, defendants faced a choice and once again acted directly in contradiction of their stated ideals.  Rather than the path of inaction, however, this time defendants chose the path of deception.  Defendants could have come clean with investors and admitted that they had been aware of the Suspected Corruption since 2005, but this would have required defendants to admit that they had lied about their professed commitment to honest and fair dealing.  They could have informed investors about the *Times*' investigation and the very real possibility that the revelation of facts that defendants had concealed for so long would: (a) increase the likelihood of civil and criminal charges, including billions of dollars in fines; (b) create uncertainty concerning Walmart's senior executives and officers who had been involved in the Suspected Corruption or its cover-up;

- 2 -

808452_1

and (c) jeopardize Walmart's international growth strategy, all of which would adversely impact Walmart, its shareholders and its stock price.  They could have.  However, they did not.

7.      Instead, on December 8, 2011, defendants filed with the Securities and Exchange Commission (the "SEC") a statement that deceived the investing public, claiming: (a) that Defendants had learned of the Suspected Corruption after February 1, 2011; (b) that their own proactive internal review had uncovered it; and (c) that upon learning of the Suspected Corruption, defendants had hired outside counsel to conduct an internal investigation, implemented appropriate remedial measures, and referred their internal investigation to the U.S. Department of Justice (the "DOJ") and to the SEC.  Not so. Defendants twisted what should have been a confession of inexcusable inaction and concealment into a phony demonstration of vigilance and virtue.

8.      On April 21, 2012, the *Times* – not the Defendants – revealed many of the facts that defendants had concealed for so long.  The *Times* reported that in 2005 and 2006, Walmart had shut down an investigation into the Suspected Corruption, even though the allegations had come from a former senior attorney with Walmart de Mexico and were backed by a paper trail of hundreds of suspect payments totaling more than $24 million.  The article also revealed that top executives at Walmart and Walmart International, ***including Duke himself***, knew about the bribery scheme, but rejected calls for a legitimate investigation.  As described, the corruption scheme involved millions of dollars in bribes paid to Mexican officials that "played a persistent and significant role in Wal-Mart's rapid

growth in Mexico." *See* David Barstow, *Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle*, N.Y. Times, Apr. 22, 2012, at A1.

9.      Billions of dollars of shareholder value was erased immediately after the *Times*' revelation of the facts defendants had theretofore concealed.  The facts defendants had misrepresented and concealed revealed that Walmart's stock had not been worth as much as defendants had led investors to believe.  Walmart's stock price fell $2.91 one day and another $1.77 the next day, amounting to its largest one- and two-day drops since the stock markets had bottomed out over three years earlier.  Weeks later, Walmart's stock price increased due to a quarterly performance surprise, but investors never recovered what they had overpaid for Walmart's stock during the Class Period.

10.      Walmart is now the subject of multiple probes in Mexico by Mexican authorities and the subject of criminal and congressional investigations in the United States. The allegations the *Times* exposed have not only been corroborated, but Walmart has acknowledged that investigations into its potential violations of the Foreign Corrupt Practices Act ("FCPA") now extend to include Brazil, China, and India.

## JURISDICTION AND VENUE

11.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

12.      Venue is proper in this District pursuant to §27 of the 1934 Act.  Defendant Walmart is headquartered in this District, and many of the false and misleading statements originated in this District.  Defendants transact business and may be found in this District.

808452_1

13.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

14.     Lead Plaintiff City of Pontiac General Employees' Retirement System ("Lead Plaintiff") purchased the common stock of Walmart during the Class Period as set forth in the certification attached hereto and was damaged as the result of defendants' wrongdoing as alleged in this complaint.

15.     Defendant Walmart operates retail stores in various formats worldwide.

16.     Defendant Duke was the Company's Vice Chairman and the head of Walmart International from 2005 until 2009, when he began his rein as the Company's CEO, President and a member of Walmart's Board of Directors.

17.     Duke, because of his position with the Company, possessed the power and authority to control the contents of Walmart's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  He personally reviewed and signed the false and misleading statements alleged herein.  Because of his position with the Company, and his access to material non-public information available to him, but not to the public, including direct email correspondence, Duke was aware that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations he and Walmart made were materially false and misleading.  Duke is liable for the materially false, misleading, and incomplete statements pleaded herein.

- 5 -

## BACKGROUND

18.     Walmart operates retail stores in various formats worldwide.  It operates retail stores, restaurants, discount stores, supermarkets, supercenters, hypermarkets, warehouse clubs, apparel stores, Sam's Clubs, and neighborhood markets, as well as walmart.com and samsclub.com.  The Company's stores offer an enormous variety of low-cost products and services, ranging from appliances and clothing to groceries and guns to cellular-service plans and tire-and-battery centers.  The Company operates over 10,000 retail units under 69 different banners in 27 countries, including the United States and Puerto Rico, as well as Africa, Argentina, Brazil, Canada, Chile, China, India, Japan, Mexico, and the United Kingdom.  It is the largest retailer in the world.

19.     Due to relatively low margins on Walmart's sales, growth in Walmart's earnings is primarily driven by opening new stores.  Thus, investors closely watch Walmart's ability to open new stores.  By the 1990s, Walmart realized that its shrinking opportunities to open new store locations in the United States made international expansion crucial.

20.     For many companies like Walmart, international expansion is the means by which expansion is achieved, and by 2010, the DOJ had become more aggressive in enforcing the FCPA.  The result was more prosecutions and a stream of record-breaking settlements.  The largest settlements included $800 million paid by Siemens AG in 2008 to settle with the DOJ and SEC, $579 million paid by KBR in 2009, $400 million paid by BAE in 2010, $365 million paid by Snamprogetti Netherlands B.V. in 2010, and $338 million paid by Technip S.A. in 2010.

- 6 -

21.     The DOJ's decisions on investigating and charging defendants are made on a discretionary basis.  This includes decisions regarding corporate defendants:

> ***Charging a corporation for even minor misconduct may be appropriate where the wrongdoing*** was pervasive and was undertaken by a large number of employees, or by all the employees in a particular role within the corporation, or ***was condoned by upper management***.  On the other hand, ***it may not be appropriate to impose liability upon a corporation, particularly one with a robust compliance program in place***, ***under a strict respondeat superior theory for the single isolated act of a rogue employee***.  There is, of course, a wide spectrum between these two extremes, and a prosecutor should exercise sound discretion in evaluating the pervasiveness of wrongdoing within a corporation.

*See* United States Attorney's Manual ("USAM") §9-28.500, Comment.

22.     A corporation's past history and the timeliness of its disclosure of wrongdoing are among the most prominent factors the DOJ expressly considers when exercising its prosecutorial discretion.  *See* USAM §§9-28.600 and 9-28.700.

## FRAUDULENT SCHEME

23.     Leading up to and throughout the Class Period, defendants were well aware that (i) investors were focused on multi-national corporations' disclosures about compliance with laws in general and anti-corruption laws, in particular; (ii) if the DOJ learned about defendants' cover-up of the Suspected Corruption, that would likely lead to a more aggressive investigation and a higher likelihood of charges; and (iii) if the public learned about defendants' cover-up of the Suspected Corruption, it would likely (a) undermine Walmart's goodwill with customers and investors; (b) create instability within Walmart's management by distracting, and imperiling the jobs of, Walmart's senior executives and officers who had been involved in the Suspected Corruption or its cover-up (including Duke and then-Vice Chairman Eduardo Castro-Wright); and (c) produce other uncertainties

- 7 -

regarding legal expenses, penalties, and Walmart's operations, including its international growth, all of which would negatively affect the price of Walmart stock.

24.     In order to avoid these consequences and inflate the apparent value of Walmart stock, defendants' fraudulent scheme operated to deceive the investing public about (i) the timing of, and circumstances leading to, their awareness of the Suspected Corruption; (ii) their response to the Suspected Corruption; and (iii) the very real possibility that the *Times* would soon reveal devastating facts that defendants had concealed for so long.  Defendants bolstered this deception with additional materially misleading statements designed to convince the investing public of defendants' uncompromising integrity and intolerance for any form of corruption or inaction in the face of potential wrongdoing.  Defendants are liable for (i) making materially false and misleading statements; and (ii) failing to disclose material adverse facts known to them that would have made the statements made by them not misleading.

25.     In its annual report, Walmart included a picture of founder Sam Walton and the following statement:



26.    Throughout the Class Period, Walmart published on its website a "Statement of

Ethics" that began with, "A message from our Chief Executive Officer," defendant Duke:



27.    In this message, Duke represented that, "It's important for us to know about

issues upfront *so we can work to resolve them immediately*.  We recognize the responsibility

that comes with that requirement."  Adding to the impression that he was the type of leader

who condemned inaction in the face of wrongdoing, Duke wrote, "*Silence can condone*

*questionable behavior* – and the actions or *inactions of just one associate who makes a poor choice can impact our entire company*."

28.     In the pages following his letter, Walmart and Duke's "Statement of Ethics," proceeded to assure investors that, "*We do not tolerate, permit, or engage in bribery, corruption, or unethical practices of any kind*.  Bribery of public officials in the U.S. and abroad is illegal under both U.S. law and the local law of the countries in which we operate." Likewise, "Walmart's policy goes beyond [both U.S. and local laws] and prohibits corrupt payments in all circumstances, whether in dealings with public officials or individuals in the private sector."  Finally, throughout the Class Period, Walmart's website confirmed that, "The Statement of Ethics reflects our commitment to continue to be a leader in our industry not only in business, but also in ethical choices and behavior."

29.     Consistent with this professed uncompromising integrity, intolerance for any form of corruption, and its condemnation of inaction in the face of potential wrongdoing, on December 8, 2011, Walmart filed its Report on Form 10-Q with the SEC for the third quarter of fiscal year 2012 (the Company's 2012 fiscal year ran from February 1, 2011 through January 31, 2012), which included the following statement:

> *During fiscal 2012*, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program.  *As a result of information obtained during that review and from other sources, the Company has begun an internal investigation* into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act.  The Company *has engaged outside counsel* and other advisors to assist in the review of these matters and *has implemented, and is continuing to implement, appropriate remedial measures*.  The Company *has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission*.  We cannot reasonably estimate the potential liability, if any, related to these matters.

- 10 -

However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows.

(the "Report on Form 10-Q Statement").  Just as he signed his letter introducing Walmart's Statement of Ethics, Duke signed the Report on Form 10-Q.[2]  Duke certified that the Report on Form 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report":

I, Michael T. Duke, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Wal-Mart Stores, Inc. (the "registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*\*\*

Date: December 8, 2011                                    /s/ Michael T. Duke
                                                          Michael T. Duke
                                                          President and Chief Executive Officer

30.    The message defendants delivered to investors was clear:

(a)     sometime after February 1, 2011, defendants obtained information related to the Suspected Corruption;

(b)     defendants were so proactive in protecting against foreign corruption, they had uncovered the Suspected Corruption themselves through Walmart's own "voluntary

---

[2]     Defendants included the same Report on Form 10-Q Statement in Walmart's Form 10-K, which Duke signed and defendants filed with the SEC on March 27, 2012.

internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program";

(c)     defendants were so virtuous, and so true to their assurances, that upon learning of the Suspected Corruption, they promptly and proactively (i) engaged outside counsel to conduct an internal investigation; and (ii) implemented appropriate remedial measures; and

(d)     defendants were so virtuous, and so true to their assurances, that upon learning of the Suspected Corruption, they promptly and proactively disclosed their internal investigation to the DOJ and to the SEC.

31.     Because Walmart and Duke's statement confirmed for investors that Defendants had done all the right things (e.g., proactively uncovering the Suspected Corruption, promptly engaging outside counsel to conduct an internal investigation, and promptly reporting the Suspected Corruption to law enforcement), Walmart appeared to be a more valuable company than it was in truth.  Its share price did not drop on December 9, 2011, the day after defendants filed the Report on Form 10-Q.  In fact, Walmart's share price rose modestly, and it continued a fairly steady climb thereafter until reaching a Class Period high of $62.48, around which it remained through Friday, April 20, 2012, when the share price was $62.45.

32.     On Saturday, April 21, 2012, however, the *New York Times* revealed that Walmart and Duke had deceived investors.  Walmart and Duke were not the vigilant and virtuous company and leader they had represented themselves to be.  As it turns out, the true facts that were known by and available to defendants Walmart and Duke were:

- 12 -

(a)     Despite representing in the Report on Form 10-Q that they had uncovered the Suspected Corruption "[d]uring fiscal 2012," Walmart and Duke had actually learned of the Suspected Corruption during calendar year *2005*, as demonstrated by the following email that Duke received over six years *before* he signed the Report on Form 10-Q:

```
    -----Original Message-----
From:   Thomas Mars
Sent:   Sat Oct 15 17:58:07 2005
To:     Mike Duke
Cc:     Tom Hyde - Executive
Subject:      IMPORTANT: WALMEX Memo

Mike:

The attached memorandum summarizes an interview conducted earlier this month with a former
WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the
company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including
senior people.

You'll want to read this. I'm available to discuss next steps.

PS: Welcome to Wal-Mart International.
```

As is apparent, far from shock at such allegations from a former in-house lawyer, Walmart's then-General Counsel, Thomas Mars, concluded his email with the ominous message, "Welcome to Wal-Mart International."  The memorandum Duke received along with this email provided pages of details concerning the Suspected Corruption.  Duke received a similar email two weeks later, which included details of corruption related to Walmart's building of a store at Teotihuacán in Mexico City, Mexico (these specific allegations were recently corroborated by other witnesses and documents, as described in David Barstow and Alexandra Xanic von Bertrab, *The Bribery Aisle:  How Wal-Mart Used Payoffs to Get Its Way in Mexico*, N.Y. Times, Dec. 17, 2012).

- 13 -

(b)      Despite representing in the Report on Form 10-Q that they had uncovered the Suspected Corruption through Walmart's own proactive "voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program," defendants did not ***uncover*** the Suspected Corruption.   Just the opposite.   Defendants ***covered up*** the Suspected Corruption after a former in-house lawyer had brought it to their attention over six years earlier.   The only information defendants actually uncovered "[d]uring fiscal 2012" was that the *Times* had learned of, and was actively investigating, the Suspected Corruption.   Rather than come clean, however, defendants concealed their awareness of the *Times*' investigation and used the Report on Form 10-Q Statement to rewrite history and mislead the public by painting a picture that bore no resemblance to the reality that the *Times* would reveal less than five months later.

(c)      Despite representing in the Report on Form 10-Q that upon learning of the Suspected Corruption, defendants engaged outside counsel to conduct an internal investigation, in truth, after defendants had learned of the Suspected Corruption, one of the ways defendants covered it up was to reject a proposed independent "Internal Investigation Work Plan" from outside counsel.   Another way they covered up the Suspected Corruption was to assign its "investigation" to the very office implicated in executing and/or concealing the corruption scheme:   Walmart de Mexico's General Counsel's Office.   That decision defied the advice of Walmart International's Vice President and General Counsel, Maritza Munich, who left Walmart International shortly after expressing her strong disagreement:

-----Original Message-----
From:   Maritza Munich-Legal
Sent:   Wed Jan 18 16:04:31 2006
To:     Bob Ainley - AUDIT; Michael Fung; Ronald Halter; Tom Mars - Legal; Martin J. Weinstein
(mweinstein@willkie.com)
Subject:    WALMEX: Examination of Real Estate Transactions

Further to the message below, and my communications of 1-16-06 and 1-17-06 to Bob, Michael and
Ron (forwarding email communications with Sergio Cicero prior to 7 October 2005 and emails from April
2005 related to the IAS report of WALMEX donations), following are additional comments to Ron Halter's
draft report of December 15, 2005:

                                        ***

    - The wisdom of assigning any investigative role to management of the business unit being
investigated escapes me.  Given the serious nature of the allegations, and the need to preserve the
integrity of the investigation, it would seem more prudent to develop a follow-up plan of action,
independent of WALMEX management participation, and that includes external legal advise and
professional, independent investigative resources.
*      Last paragraph
    - It is important to keep in mind that in his email to me of December 5, 2005, Sergio Cicero offers
to provide information about "other cases that were managed at that time under the same formula."
Accordingly, and as originally envisioned, the needed follow-up investigation should extend beyond the
specific transactions contained in this draft report to other potentially suspect transactions not yet
identified.


~Maritza
======================
MARITZA I. MUNICH
VP & General Counsel - International
WAL* MART STORES, INC.
(479) 277-2346

      (d)     Despite representing in the Report on Form 10-Q that upon learning of

the Suspected Corruption, defendants implemented appropriate remedial measures, whatever

remedial measures they may have implemented in 2011 were obviously not implemented in

2005, which is when defendants learned of the Suspected Corruption.

      (e)     Despite representing in the Report on Form 10-Q that upon learning of

the Suspected Corruption, defendants disclosed their internal investigation to the DOJ and to

the SEC, they did nothing of the sort when they actually learned of the Suspected Corruption

in 2005.  Instead, defendants "closed" the matter in 2006, without engaging outside counsel

- 15 -

to conduct an internal investigation, without implementing whatever remedial measures were implemented in 2011, and without referring the matter to the DOJ, the SEC, or any other law enforcement agency or third-party entity.  In fact, the closest defendants came to a law enforcement referral was the involvement of its own Director of Corporate Investigations, who was a former FBI Agent, who reviewed the implicated Walmart de Mexico General Counsel's Office inquiry and report, and found it to be "truly lacking":

| | |
|---|---|
| **From:** | Joe Lewis |
| **To:** | Ken Senser |
| **Cc:** | Joe Lewis |
| **Subject:** | RE: Gestores |
| **Date:** | Wednesday, May 10, 2006 11:34:16 AM |
| **Attachments:** | RE GestoresReport (Draft)English version.msg |

Ken,
At the risk of being cynical, that report is exactly the same as the previous which I indicated was truly lacking ( see attached). The added paragraph at the end does not change my assessment.

Joseph R. Lewis
Director of Corporate Investigations
Wal-Mart Stores, Inc.
1300 Southeast 8th Street
Bentonville, AR.  72716
(w) 479-204-3077

33.   Bolstering the false and misleading impressions from defendants' "Statement of Ethics" and their Report on Form 10-Q, on March 27, 2012, Walmart issued its annual report to shareholders, which repeated the Report on Form 10-Q Statement and included a letter signed by Duke reporting on Ethical Standards:

- 16 -

**Report on Ethical Standards**

Our Company was founded on the belief that open communications and the highest standards of ethics are necessary to be successful. Our long-standing "Open Door" communication policy helps management be aware of and address issues in a timely and effective manner. Through the open door policy all associates are encouraged to inform management at the appropriate level when they are concerned about any matter pertaining to Walmart.

Walmart has adopted a Statement of Ethics to guide our associates in the continued observance of high ethical standards such as honesty, integrity and compliance with the law in the conduct of Walmart's business. Familiarity and compliance with the Statement of Ethics is required of all associates who are part of management. The Company also maintains a separate Code of Ethics for our senior financial officers. Walmart also has in place a Related-Party Transaction Policy. This policy applies to Walmart's senior officers and directors and requires material related-party transactions to be reviewed by the Audit Committee. The senior officers and directors are required to report material related-party transactions to Walmart. We maintain a global ethics office which oversees and administers an ethics helpline. The ethics helpline provides a channel for associates to make confidential and anonymous complaints regarding potential violations of our statements of ethics, including violations related to financial or accounting matters.

*Michael T. Duke*

Michael T. Duke
President and Chief Executive Officer

34.     As shown, several of the statements within the Report on Form 10-Q were objectively and materially false. In addition, the overall impression defendants intended to create, and did create, through the Report on Form 10-Q Statement and the additional statements identified above were materially misleading. Put simply, by design, defendants' statements gave investors the false impression that the last thing they had to fear was that defendants had covered up the Suspected Corruption for years. Tellingly, after having twice used the language of the Report on Form 10-Q Statement, including as recently as in Walmart's March 27, 2012 Report on Form 10-K, defendants drastically changed their

- 17 -

description after the *Times* had exposed their scheme on April 20, 2012. Six weeks later, in Walmart's June 1, 2012 Report on Form 10-Q, defendants no longer represented that they had uncovered the Suspected Corruption in fiscal 2012 or that upon learning of it, they had engaged outside counsel to perform an internal investigation, referred it to the SEC and the DOJ, or implemented appropriate remedial measures. Because the falsity of these representations had been exposed, defendants presented a vastly different portrayal:

> The Audit Committee (the "Audit Committee") of the Board of Directors of the Company, which is composed solely of independent directors, is conducting an internal investigation into, among other things, alleged violations of the U.S. Foreign Corrupt Practices Act ("FCPA") and other alleged crimes or misconduct in connection with foreign subsidiaries, including Wal-Mart de México, S.A.B. de C.V. ("Walmex"), and ***whether prior allegations of such violations and/or misconduct were appropriately handled by the Company***.

Defendants continued to use this new language in Walmart's September 6, 2012 and December 4, 2012 Reports on Form 10-Q. The December 4, 2012 Report on Form 10-Q also acknowledged that Walmart was incurring costs of more than $10 million each month due to defendants' misconduct, noting:

> The Company has incurred expenses of approximately $48 million and $99 million during the three and nine months ended October 31, 2012, respectively, related to these matters. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company expects that there will be ongoing media and governmental interest, including additional news articles from media publications on these matters, which could impact the perception among certain audiences of the Company's role as a corporate citizen.

Again, "these matters" entailed the same Suspected Corruption that defendants had twice previously described quite differently.

- 18 -

35.     Defendants' deception artificially inflated the perceived value of Walmart common stock and ***inflicted more than one billion dollars of damages upon Lead Plaintiff and the members of the Class***.

36.     Duke also personally benefitted from this scheme because, among other things, it enabled him to avoid investors', and honest directors', demands for a new CEO – someone who did not cover up the Suspected Corruption for so long.  Instead, Duke maintained a position that has rewarded him with over $100 million in benefits since he began covering up the Suspected Corruption.

## SCIENTER

37.     As shown above, in the year 2005, Duke personally received the detailed allegations regarding the Suspected Corruption.  Not only that, he received this information from Walmart's then-General Counsel, the highest ranking lawyer in the entire Company, who expressly advised Duke to look at the allegations.  Duke possessed the requisite scienter that he was deceiving the investing public when he signed, certified, and caused the December 8, 2011 Report on 10-Q Form to be filed because, among other things, he was aware that:

(a)     Walmart and Duke had been informed of the Suspected Corruption in 2005, not 2011;

(b)     Walmart and Duke had learned of the Suspected Corruption from a former in-house attorney who had brought it to their attention, not from Walmart's own proactive internal robust compliance program;

(c)      Walmart and Duke had not referred the Suspected Corruption to outside counsel for an internal investigation back in 2005 when they learned of it, but rather had rejected advice to do so, and only relented in late 2011 when they realized the *Times* could reveal at any time the facts Walmart and Duke had concealed for so long;

(d)      Walmart and Duke had not referred the Suspected Corruption to the SEC or the DOJ when they learned of it in 2005, but rather not until November 2011; and

(e)      that whatever remedial measures Walmart and Duke implemented in 2011, they had clearly not implemented them after they had learned of the Suspected Corruption back in 2005.

38.      Given all of his direct personal knowledge, Duke was also plainly aware that he and Walmart buttressed their deception of the investing public with their Statement of Ethics, including Duke's hand-signed "Message," and Duke's hand-signed "Report on Ethical Standards."  For example, Duke knew that his professed condemnation of inaction in the face of suspected wrongdoing was itself deceptive inasmuch as he was one of the individuals most responsible for Walmart's years of inaction in the face of the Suspected Corruption.  But Duke did far worse than condone the Suspected Corruption through his inaction, he encouraged such illicit tactics by supporting the promotion of one of the main instigators of the Suspected Corruption:  Eduardo Castro-Wright.  Duke possessed the requisite scienter as to the materially false, misleading, and incomplete nature of his Class Period statements.

## LOSS CAUSATION

39.     As a result of defendants' scheme, Walmart was overvalued throughout the Class Period.  The *Times*' revelation of the facts and circumstances defendants had misrepresented and concealed ***exposed*** both defendants' scheme and the overvaluation from the scheme.  One measure of that inflated value was Walmart's stock price, which fell $2.91 per share to close at $59.54 per share on April 23, 2012, the first trading day after the publication of the *Times* article, a decline of nearly 5% on volume of 38 million shares.  The stock continued to drop on April 24, 2012, to close at $57.77 per share on volume of 30 million shares, and fell to $57.36 on April 25, 2012, on volume of 28 million shares, as the market continued to process the implications of defendants' scheme and wrongful course of business.  The revelation of defendants' scheme revealed that investors had paid more for Walmart stock than they would have paid but for the scheme.[3]

40.     The market's reaction mirrored the reactions of analysts, journalists, and academics.  On April 23, 2012, *Forbes* reported that, "[a]fter a decade of carefully encouraging companies to report misbehavior early, the Justice Department may be under pressure to make an example of Wal-Mart."  The article referred to an analysis that showed SEC and DOJ penalties for FCPA violations are usually about 1% to 2% of annual sales, which would amount to $4.5 billion for Walmart.  The article also explained that "[t]he

---

[3]     Weeks later, Walmart's stock price increased due to a quarterly performance surprise, but investors never recovered what they had overpaid for Walmart's stock during the Class Period.

greater impact will be on Wal-Mart's Mexican growth.  A slowdown in new story openings could mean a 5% decrease in growth, a $1.3 billion loss, according to the UBS analysis."

41.     Also on April 23, 2012, *Reuters* reported that "[a]llegations that Wal-Mart Stores Inc stymied an internal investigation into extensive bribery at its Mexican subsidiary are likely to lead to years of regulatory scrutiny and could eventually cost some executives their jobs."  According to Michael Koehler, a professor at Butler University and FCPA expert, "'Because of Wal-Mart's inaction for a very long time, it's likely its exposure is only going to increase.'"  Deutsche Bank retail analyst said that if the allegations are proven true, "'[i]t would put a broadside in the growth engine of the company.'"  "'Unlike prior PR stories in recent years, this will be a material distraction for Wal-Mart on multiple fronts.'"

42.     On April 24, 2012, the *Los Angeles Times* reported that, according to BMO Capital Markets analyst Wayne Hood, "[t]he bribery allegations 'will be used against the company by activists and companies when it attempts to open stores in the U.S. and abroad, and could make it more difficult to attract management talent in international markets.'"

43.     On April 26, 2012, *The Wall Street Journal's* MarketWatch reported that UBS analyst Robert Carroll, citing research by three professors, estimated Walmart's investigation and legal fees would amount to $2.76 billion.

44.     On April 30, 2012, the *Times* reported that in the wake of the *Times*' revelation of the facts defendants had concealed, a Walmart building permit in Los Angeles was "getting a once-over.  In New York, the City Council is investigating a possible land deal with the retailer's developer in Brooklyn.  A state senator in California is pushing for a formal audit of a proposed Wal-Mart in San Diego.  And in Boston and its suburbs, residents

- 22 -

are pressuring politicians to disclose whether they have received contributions from the company." According to Dorian T. Warren, a political science professor at Columbia who is writing a book about Walmart, "'[o]vernight, the environment has shifted in terms of Wal-Mart's strategy in big cities, in winning over local politicians.'"

45.   More recently, on January 10, 2013, after lawmakers received and released several Walmart emails, including the one Duke received on October 15, 2005 (*see* ¶32(a)), Congressmen Elijah E. Cummings and Henry A. Waxman wrote,

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

January 10, 2013

Mr. Michael T. Duke
Chief Executive Officer
Wal-Mart Stores, Inc.
702 SW 8th Street
Bentonville, AR 72716

Dear Mr. Duke:

We are writing regarding new allegations that Wal-Mart systematically bribed officials throughout Mexico in order to evade zoning, environmental, and permitting laws at the company's Bodega Aurrera store in Teotihuacan, Mexico. We are concerned that your company's public statements that the company was unaware of the allegations appear to be inconsistent with documents we have obtained through our investigation. Contrary to Wal-Mart's public statements, the documents appear to show that you were personally advised of the allegations in October 2005.

*** 

Elijah E. Cummings
Ranking Member
Committee on Oversight and
Government Reform

Henry A. Waxman
Ranking Member
Committee on Energy and
Commerce

cc:    The Honorable Darrell E. Issa, Chairman
       Committee on Oversight and Government Reform

       The Honorable Fred Upton, Chairman
       Committee on Energy and Commerce

- 23 -

As can be seen, relying on many of the same documents described above, Ranking Members of key Congressional Committees have already observed that, "Contrary to Wal-Mart's public statements, the documents appear to show that you were personally advised of the allegations in October 2005."

46.     Defendants' Reports on Forms 10-Q and 10-K and the *Times*' April 21, 2012 article concerned the same subject:   the Suspected Corruption and how defendants responded to it.  Defendants' description of the Suspected Corruption and their handling of it triggered no reaction from the market, analysts, journalists, or academics because defendants twisted what should have been a confession of inexcusable inaction and concealment into a phony demonstration of vigilance and virtue.  In contrast, the *Times*' candid description triggered a dramatic reaction from the market, analysts, journalists, and academics because the *Times* revealed the true nature of the Suspected Corruption and defendants' reprehensible response to it.  The vast disparity in these reactions is a direct reflection of the vast disparity between the dishonesty of defendants' statements versus the honesty of the *Times*' article.

## CLASS ACTION ALLEGATIONS

47.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Walmart common stock during the Class Period (the "Class") and suffered economic harm as a result thereof. Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

808452_1

48.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Walmart has over 3.4 billion shares of stock outstanding, owned by thousands of persons, who traded hundreds of millions of shares during the Class Period.

49.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the perceived value of Walmart common stock was artificially inflated;

(f)     whether the price of Walmart common stock was artificially inflated; and

(g)     the extent of damage sustained by Class members and the appropriate measure of damages.

- 25 -

50.     Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from defendants' wrongful conduct.

51.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

52.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

53.     Lead Plaintiff incorporates ¶¶1-52 by reference.

54.     During the Class Period, defendants made, approved, and disseminated the statements specified above, which they knew and deliberately disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 26 -

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Walmart common stock during the Class Period.

56.      Lead Plaintiff and the Class relied on defendants' publicly known material misrepresentations and omissions in that Walmart common stock traded in an efficient market and Lead Plaintiff and the Class purchased Walmart stock between the time the misrepresentations were made/concealed facts were omitted and the time the truth was revealed.

57.      Lead Plaintiff and the Class have suffered damages in that defendants' scheme caused them to pay more for Walmart stock than they would have but for defendants' scheme.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

58.      Lead Plaintiff incorporates ¶¶1-57 by reference.

59.      Duke acted as a controlling person of Walmart within the meaning of §20(a) of the 1934 Act.  By virtue of his position with the Company, Duke had the power and authority to cause Walmart to engage in the wrongful conduct complained of herein. Walmart controlled all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

- 27 -

B.     Awarding Lead Plaintiff and the members of the Class damages, including

interest;

C.     Awarding Lead Plaintiff's reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just

and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED:  February 14, 2013          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DARREN J. ROBBINS
                                   JASON A. FORGE


                                   _____
                                             s/ JASON A. FORGE
                                            JASON A. FORGE

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   Lead Counsel for Plaintiff

                                   PATTON TIDWELL & SCHROEDER LLP
                                   NICHOLAS H. PATTON
                                   4605 Texas Blvd.
                                   Texarkana, TX  75503
                                   Telephone:  903/792-7080
                                   903/792-8233 (fax)
                                   nickpatton@texarkanalaw.com

                                   Liaison Counsel

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN  37201-1601
Telephone:  615/244-2202
615/252-3798 (fax)

Additional Counsel for Plaintiff

## AMENDED CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

    1.    Plaintiff has reviewed a complaint filed and adopts its allegations.

    2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

    3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

    4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

    5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Pontiac General Emps. Ret. Sys. v. Schweitzer-Mauduit, et al.*, No. 1:10-cv-00711 (N.D. Ga.)
*City of Pontiac General Emps. Ret Sys. v. Lockheed Martin Corporation, et al.* No. 1:11-cv-05026 (S.D.N.Y.)

    (b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Willis v. Big Lots, Inc., et al.*, No. 2:12-cv-00604 (S.D. Ohio)

    (c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Pontiac General Emps. Ret. Sys. v. Stryker, Inc.*, No. 10-cv-00376 (S.D.N.Y.)
*Bach v. Amedisys, Inc.*, No. 3:10-cv-00395 (M.D. La.)
*Russo v. Finisar Corp.*, No. CV 11-1252 (N.D. Cal.)
*In re Longtop Financial Technologies Limited Sec. Litig.*, No. 11-cv-03658 (S.D.N.Y.)
*Greenberg v. The Cooper Companies, et al.*, No. 11-cv-05697 (N.D. Cal.)
*In re Health Management Associates, Inc. Sec. Litig.*, No. 2:12-cv-45 (M.D. Fla.)
*Fifield v. Green Mountain Coffee Roasters, Inc., et al.*, No. 2:12-cv-00091 (D. Vt.)

WAL-MART

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _6_ day of _December_, 2012.

> CITY OF PONTIAC GENERAL
> EMPLOYEES' RETIREMENT SYSTEM
>
> By: _____
>
> Its: _ADMINISTRATOR_____

- 2 -

WAL-MART

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 12/27/2011 | 1,750 | $59.77 |
| 02/10/2012 | 4,460 | $61.47 |
| 02/16/2012 | 750 | $61.98 |
| 03/27/2012 | 3,100 | $61.10 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/05/2012 | 360 | $59.13 |
| 01/20/2012 | 305 | $60.96 |
| 03/30/2012 | 750 | $61.17 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 14, 2013.

s/ JASON A. FORGE
JASON A. FORGE

ROBBINS GELLER RUDMAN
&amp; DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: jforge@rgrdlaw.com

# Mailing Information for a Case 5:12-cv-05162-SOH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **H. William Allen**
  hwallen@allenlawfirmpc.com,njjackson@allenlawfirmpc.com

- **Jess L. Askew , III**
  jaskew@williamsanderson.com,smcghee@williamsanderson.com,fbeaugard@williamsanderson.com,ssmith@williamsanderson.com

- **George Edward Barrett**
  gbarrett@barrettjohnston.com,lbrock@barrettjohnston.com

- **Cynthia J. Billings**
  cbillings@swappc.com,

- **Theodore J. Boutrous , Jr**
  tboutrous@gibsondunn.com

- **George H. Brown**
  GBrown@gibsondunn.com,MMangiardi@gibsondunn.com

- **Jonathan C. Dickey**
  jdickey@gibsondunn.com,aarias@gibsondunn.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **Jamie Fugitt**
  jfugitt@williamsanderson.com,nmoler@williamsanderson.com

- **Willie S. Haley**
  wshaley@allenlawfirmpc.com,njjackson@allenlawfirmpc.com

- **Douglas S. Johnston , Jr**
  djohnston@barrettjohnston.com,

- **Brian M. Lutz**
  blutz@gibsondunn.com,aarias@gibsondunn.com

- **Timothy L. Miles**
  tmiles@barrettjohnston.com,

- **Marie-Bernarde Miller**
  mmiller@williamsanderson.com,nmoler@williamsanderson.com

- **Alexander Mircheff**
  amircheff@gibsondunn.com,inewman@gibsondunn.com

- **Danielle Myers**
  danim@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nicholas H. Patton**
  nickpatton@texarkanalaw.com,mlong@texarkanalaw.com

- **Mark Andrew Perry**
  mperry@gibsondunn.com

- **Teresa M. Wineland**
  twineland@williamsanderson.com,creed@williamsanderson.com