IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated                                              PLAINTIFF

NO. 12-5162

WALMART STORES, INC. and
MICHAEL T. DUKE                                                 DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Currently before the undersigned is Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 89), Plaintiff's Response (Doc. 94), Defendants' Reply thereto (Doc. 98), and Supplements filed by both Plaintiff and Defendants (Docs. 129, 130). For the reasons set forth below, the undersigned recommends that Defendants' Motion to Dismiss be DENIED.

## BACKGROUND

Plaintiff City of Pontiac General Employees' Retirement System ("Plaintiff") brings this securities fraud putative class action on behalf of all persons who purchased or otherwise acquired the common stock of Walmart Stores, Inc. ("Walmart") between December 8, 2011 and April 20, 2012. Plaintiff names as Defendants Walmart and Michael T. Duke, the Vice Chairman and the head of Walmart International from 2005 until 2009, when he became Walmart's Chief Executive Officer and President and a member of Walmart's Board of Directors. Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act

-1-

of 1934, 15 U.S.C. § 78j(b) and 78t(a), and violations of Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

Specifically, Plaintiff alleges that on April 21, 2012, the New York Times published an article entitled, "Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle." According to the article, in September 2005, a senior Walmart lawyer received information from a former executive at the company's largest foreign subsidiary, Walmart de Mexico, describing how Walmart de Mexico had orchestrated a bribery scheme (referred to by Plaintiff and hereinafter referred to by the undersigned as "the suspected corruption") to obtain building permits throughout Mexico. The article reported that within days, Walmart investigators discovered evidence of widespread bribery, with a paper trail of hundreds of suspect payments totaling more than $24 million. According to the article, Duke, who, at that time, had just been put in charge of Walmart International, making him responsible for all foreign subsidiaries, received an e-mail from a top Walmart lawyer on October 15, 2005, with a detailed description of the suspected corruption allegations. The e-mail from Walmart's then general counsel, Thomas Mars, to Duke stated:

> The attached memorandum summarizes an interview conducted earlier this month with a former WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including senior people.
>
> You'll want to read this. I'm available to discuss next steps.
>
> PS: Welcome to Wal-Mart International.

(Doc. 86 ¶ 32 at pg. 14.)

AO72A
(Rev. 8/82)

The Times article reported that top executives at Walmart and Walmart International, including Duke, rejected calls for a legitimate investigation and effectively shut down the investigation into the suspected corruption. According to Plaintiff, Defendants "covered up" the suspected corruption by rejecting a proposed independent "Internal Investigation Work Plan" from outside counsel and by assigning the investigation to the very office implicated in executing and/or concealing the corruption scheme - - Walmart de Mexico's General Counsel's Office.

Plaintiff alleges that in the Fall of 2011, Defendants learned that the New York Times was investigating the suspected corruption. Plaintiff alleges that Defendants, at this juncture, "could have come clean with investors and admitted that they had been aware of the suspected corruption since 2005, . . . [but] [i]nstead, on December 8, 2011, [D]efendants filed with the Securities and Exchange Commission (the "SEC") a statement that deceived the investing public . . . ." The Statement to which Plaintiff refers is Walmart's "Form 10-Q" quarterly report to the SEC, which consists of 43 pages. Plaintiff points to a paragraph of the Form 10-Q, under the subsections Legal Proceedings, Other:

> During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission. We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, result of operations or cash flows.

(Doc. 89-1 at pg. 38.) Plaintiff alleges that the above statement deceived the investing public by claiming:

> (a) that Defendants had learned of the Suspected Corruption after February 1, 2011; (b) that their own proactive internal review had uncovered it; and (c) that upon learning of the Suspected Corruption, defendants had hired outside counsel to conduct an internal investigation, implemented appropriate remedial measures, and referred their internal investigation to the U.S. Department of Justice (the "DOJ") and to the SEC.  Not so. . . [Defendants] actually learned of the Suspected Corruption in 2005 . . . [and] "closed" the matter in 2006, without engaging outside counsel to conduct an internal investigation, without implementing whatever remedial measures were implemented in 2011, and without referring the matter to the DOJ, the SEC, or any other law enforcement agency or third-party entity. . . .
>
> [Defendants] operated to deceive the investing public about (i) the timing of, and circumstances leading to, their awareness of the Suspected Corruption; (ii) their response to the Suspected Corruption; and (iii) the very real possibility that the *Times* would soon reveal devastating facts that defendants had concealed for so long.

(Doc. 86 at ¶¶ 7, 24, 32.)  Plaintiff asserts that Defendants statements in the Form 10-Q[1] "gave investors the false impression that the last thing they had to fear was that defendants had covered up the Suspected Corruption for years." (Id. ¶ 34.)

Plaintiff alleges that after the New York Times article revealed the facts that Defendants had concealed, "[b]illions of dollars of shareholder value was erased immediately." (Id. at ¶ 9.) According to Plaintiff, Walmart's stock price fell $2.91 per share on April 23, 2012, the first trading day after the publication of the Times article, and the stock continued to drop another $2.18 on April 25, 2012, amounting to the largest one- and two-days drops since the stock

---

[1]Plaintiff points to other misleading statements made by Defendants, but the undersigned finds it unnecessary to address these statements, because, as discussed below, the undersigned believes Plaintiff's allegations regarding the statements made in the Form 10-Q are sufficient to state a claim.

markets had bottomed out over three years earlier. Plaintiff contends that while weeks later the stock price increased "due to a quarterly performance surprise, . . . investors never recovered what they had overpaid for Walmart's stock during the Class Period[2]." (Id.)

Plaintiff alleges that six weeks after the New York Times article was published, in Walmart's June 1, 2012 Report on Form 10-Q, Defendants "presented a vastly different portrayal:"

> The Audit Committee . . . of the Board of Directors of the Company, which is composed solely of independent directors, is conducting an internal investigation into, among other things, alleged violations of the U.S. Foreign Corrupt Practices Act ("FCPA") and other alleged crimes or misconduct in connection with foreign subsidiaries, including Wal-Mart de Mexico . . . and ***whether prior allegations of such violations and/or misconduct were appropriately handled by the Company***.

(Id. ¶ 34) (emphasis added).)

Plaintiff alleges that in its December 4, 2012 Form 10-Q Report, Walmart acknowledged that it was incurring costs of more than $10 million each month due to Defendants' misconduct:

> The Company has incurred expenses of approximately $48 million and $99 million during the three and nine months ended October 31, 2012, respectively, related to these matters. These matters may require the involvement of certain members of the Company's senior management that could impinge on the time they have available to devote to other matters relating to the business. The Company expects that there will be ongoing media and governmental interest, including additional news articles from media publications on these matters, which could impact the perception among certain audiences of the Company's role as a corporate citizen.

(Id.) Plaintiff contends that Walmart is now the subject of multiple probes in Mexico by Mexican authorities and the subject of criminal and congressional investigations in the United

---

[2]The class period identified by Plaintiff begins on December 8, 2011, the date Walmart filed its Form 10-Q with the SEC, to April 20, 2012, the day before the New York Times article was published.

States. Plaintiff alleges that after lawmakers received and released several Walmart emails, including the one Duke received on October 15, 2005, the Congressional Committee on Oversight and Government Reform and the Committee on Energy and Commerce sent the following letter to Duke on January 10, 2013:

> Dear Mr. Duke:
>
> We are writing regarding new allegations that Wal-Mart systematically bribed officials throughout Mexico in order to evade zoning, environmental, and permitting laws at the company's Bodega Aurrera store in Teotihuacan, Mexico. We are concerned that your company's public statements that the company was unaware of the allegations appear to be inconsistent with documents we have obtained through our investigation. Contrary to Wal-Mart's public statements, the documents appear to show that you were personally advised of the allegations in October 2005.

(Id. ¶ 45.) Plaintiff further alleges that analysts, journalists, and academics have all opined that Walmart could face financial penalties for violating the FCPA (based on one analysis, the penalties could be up to $4.5 billion); a slow down in new store openings; and investigation and legal fees of up to $2.76 billion.

Defendants move to dismiss Plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has failed to state a claim.

## DISCUSSION

### Rule 12(b)(6) Standard

Plaintiff's complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility of a complaint turns on whether the facts alleged allow the Court to draw the reasonable inference that the Defendants are liable for

AO72A
(Rev. 8/82)

the misconduct alleged. <u>Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.</u>, 641 F.3d 1023, 1027 (8th Cir. 2011). The Court accepts as true all factual allegations, but is not bound to accept as true a legal conclusion couched as a factual allegation. <u>Iqbal</u>, 556 U.S. at 678. Threadbare recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. <u>Id.</u> The Court may consider, in addition to the pleadings, materials embraced by the pleadings and materials that are part of the public record. <u>Detroit Gen. Ret. Sys. v. Medtronic, Inc.</u>, 621 F.3d 800, 805 (8th Cir. 2010).

The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C § 78u-4(b), provides that, to survive a motion to dismiss, a securities plaintiff must satisfy two heightened standards. First, the plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading. 15 U.S.C. § 78u-4(b)(1). In addition, the plaintiff must plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## Count One - Section 10(b)/Rule 10b-5 Claim

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b-5 implements [§ 10(b)] by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011).

To prevail, a § 10(b)/Rule 10(b)-5 claimant must show:

(1) a material misrepresentation or omission by the defendant;

(2) scienter;

(3) a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission;

(5) economic loss; and

(6) loss causation.

See Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc., 552 U.S. 148, 157 (2008); Minneapolis Firefighters' Relief Ass'n, 641 F.3d at 1028.

**Actionable False Statement**

Defendants first argue that Plaintiff's complaint is subject to dismissal because Plaintiff has failed to allege an actionable false statement. Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury. See In re K-tel Intern., Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002). The Supreme Court has defined a standard of materiality to determine when a statement or omission would be considered false or materially misleading by a reasonable investor. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). The standard is whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having "significantly altered the total mix of information made available." Id. at 231-32.

In <u>Public Pension Fund Group v. KV Pharm.</u>, 679 F.3d 972, 981 (8th Cir. 2012), the defendant pharmaceutical company filed annual reports with the SEC, making specific representations regarding its compliance with Food and Drug Administration ("FDA") regulations. The plaintiff investors alleged that these representations were false or misleading because the defendant had been issued "Form 483s" from the FDA, notifying the Defendant of violations observed during inspections. The defendant argued that allegations of the company's receipt of Form 483s did not satisfy the materiality requirement of a securities fraud claim because Form 483s did not implicate a company's compliant status with FDA regulations – they only listed observations from FDA inspections and did not represent a final determination regarding FDA compliance. The Eighth Circuit rejected this contention, holding that there was a substantial likelihood that disclosure of receipt of the Form 483s during the same time period the defendant was representing that it was in material compliance with FDA regulations would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. <u>Id.</u> The Court further held that as the defendant affirmatively represented that it was compliant with FDA regulations, it had a duty to "make a full disclosure of any material facts." <u>Id.</u> at 983 n.8. The Court reasoned that the issuance of a Form 483 represents a risk that the FDA may take corrective action against a company, and thus, a company is obligated to assess the seriousness of the risk and disclose such information to potential investors if it also represents it is in compliance with FDA regulations.

In the present case, Defendants essentially stated in their December 8, 2011 SEC Form 10-Q quarterly report that "***during fiscal 2012***": Walmart had begun conducting a "voluntary internal review" and had begun an "internal investigation" into whether permitting, licensing and

-9-

inspections were in compliance with the FCPA; that Wal Mart had engaged outside counsel and other advisors to assist in the review and had implemented remedial measures; that Walmart had disclosed the internal investigation to the DOJ and SEC; and that Walmart did not believe these matters would have a material adverse effect on the company. Defendants contend that none of these statements were false and that they did not omit any information which they had a duty to disclose. While the statements may have been technically true, the undersigned believes that Plaintiff has sufficiently alleged that omission of the 2005 revelation of the suspected corruption and Defendants' 2005 and 2006 investigation rendered Defendants' statements in the Form 10-Q materially misleading to a reasonable investor. Without any reference to the 2005 and 2006 events, a reasonable investor could have certainly been left with the impression that Defendants only learned of the suspected corruption in fiscal year 2012, and that, upon learning of the suspected corruption at that time, Defendants promptly began investigating and referred the matter to the DOJ and SEC. As in KV Pharmaceutical, the undersigned believes that disclosure of the 2005 and 2006 events would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. This conclusion is supported by the fact that just six months later, after the publication of the New York Times article, Walmart recognized the materiality of the 2005 and 2006 events, as it disclosed them in its June 2012 Form 10-Q, reporting that it was investigating whether prior allegations of violations of the FCPA were appropriately handled by the company. This conclusion is also supported by Plaintiff's allegations regarding the drop in stock price, the significant expenses Walmart incurred as a result of the alleged mishandling of the prior allegations, the criminal and

congressional investigation of these matters, and public speculation about the possible financial penalties Walmart could face for allegedly violating the FCPA.

Based upon the foregoing, the undersigned concludes that Plaintiff has sufficiently alleged an actionable false statement.

**Scienter**

Defendants next argue that even if Plaintiff has sufficiently alleged that certain statements or omissions were actionably false or misleading, Plaintiff has failed to plead scienter under the PSLRA's heightened pleading standard. Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity. Medtronic, 621 F.3d at 808. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Minneapolis Firefighters' Relief Ass'n, 641 F.3d at 1029. In determining whether the pleaded facts give rise to a strong inference of scienter, the Court must take into account plausible opposing inferences. Id. The inference of scienter must be more than merely reasonable or permissible; a complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007). Allegations that a defendant made materially misleading statements, while in possession of conflicting information, support a strong inference of scienter. See Elam v. Neidorff, 544 F.3d 921, 929 (8th Cir. 2008). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew

-11-

facts or had access to information suggesting that their public statements were materially inaccurate." Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001) (citing City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1260-61 (10th Cir. 2001), which held that in the case of omissions, scienter is proved by knowledge of omitted fact plus knowledge that the omission would be likely to mislead).

The undersigned believes that Plaintiff has sufficiently alleged that Defendants knew the omission in the December 2011 Form 10-Q of the 2005 revelation of the suspected corruption and Defendants' 2005 and 2006 investigation was materially misleading. This conclusion is supported by Plaintiff's allegations that Duke, in an email from a top Walmart lawyer in October 2005, had been given a detailed description of the suspected corruption allegations; that top executives at Walmart and Walmart International, including Duke, rejected calls for a legitimate independent investigation and effectively shut down the investigation by assigning it to Walmart de Mexico's General Counsel's Office, the very office implicated in the corruption scheme; and that Walmart recognized the materiality of the 2005 and 2006 events in its June 2012 Form 10-Q, when it disclosed that it was investigating whether prior allegations of violations of the FCPA were appropriately handled. See Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001) (factor relevant in determining scienter is closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information); Fecht v. Price Co., 70 F.3d 1078, 1083-84 (9th Cir. 1995) (shortness in time between original statement and revelations of contrary information is circumstantial evidence that original statement was false when made), cert. denied, 517 U.S. 1136 (1996). Accordingly, the undersigned concludes that Plaintiff has sufficiently alleged that Defendants acted with the requisite scienter.

### Count Two - Section 20(a) Claim

Controlling person liability under § 20(a) of the Securities Exchange Act serves the purpose of preventing entities from using agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws. See Lustgraaf v. Behrens, 619 F.3d 867, 874 (8th Cir. 2010). To that end, the statute provides for liability for those who directly or indirectly control a primary violator of the federal securities laws. See id. Controlling person liability is derivative and requires a plaintiff to prove that the primary violator violated federal securities laws. See id. Defendants argue that because Plaintiff has failed to state a claim for a violation of the Securities Exchange Act by Walmart, Plaintiff likewise has failed to state a claim for controlling person liability against Duke. The undersigned sees no merit to this argument, given the undersigned's above findings that Plaintiff has sufficiently stated a claim against Walmart.

### CONCLUSION

Based upon the foregoing, the undersigned recommends that Defendants' Motion to Dismiss (Doc. 89) be **DENIED**.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

AO72A
(Rev. 8/82)

DATED this 8th day of May, 2014.

>  /s/ Erin L. Setser
>  HONORABLE ERIN L. SETSER
>  UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)